# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FEDERAL MARITIME           )
COMMISSION,                )
                           )
        Plaintiff,         )
                           )
    v.                     )        Civil Case No. 08-1895 (RJL)
                           )
CITY OF LOS ANGELES,       )
CALIFORNIA, *et al.*,      )
                           )
        Defendants.        )

## MEMORANDUM OPINION
(April 1⟨, 2009) [Dkt. #3]

The Federal Maritime Commission ("FMC") has filed an unprecedented

motion for a preliminary injunction pursuant to the Shipping Act of 1984, as

amended, 46 U.S.C. §§ 40101 *et seq.*, to enjoin certain discrete portions of the Port

of Los Angeles's ("POLA") and Port of Long Beach's ("POLB") (collectively, the

"Ports") respective Clean Truck Programs ("CTPs"). The CTPs are environmental

programs aimed at reducing the air pollution caused by the trucks used to transport

cargo to and from the Ports. The FMC alleges that an agreement between the

Ports to discuss and potentially coordinate their CTPs is likely, by a reduction in

competition, to cause an unreasonable increase in transportation costs and

decrease in transportation service, in violation of Section 6(g) of the Shipping Act.

Because the FMC has not made a sufficient showing of either a likelihood of

success on the merits or irreparable harm to warrant the extraordinary relief of a preliminary injunction, the FMC's motion is DENIED.

## BACKGROUND

### A.   *The Ports' Clean Truck Programs*

POLA and POLB are neighboring, and competing, ports in Los Angeles County's San Pedro Bay which together form the largest port area in the United States.[1]   (Am. Compl. ¶ 38 [Dkt. #46].)   Approximately 40 percent of the United States' import and export container traffic flows through the Ports, making them critical components of the nation's economy.   (*Id.*; Decl. of John M. Holmes ("Holmes Decl.") ¶ 41.)   Containers unloaded and loaded at the Ports are transported, or "drayed," by trucks to and from off-port terminals, rail yards, and other locations outside of the Ports at the expense of the cargo's owners.   (Am. Compl. ¶ 39.)   Drayage services are provided by Licensed Motor Carriers ("LMCs") that either employ truck drivers or contract with independent truck drivers, known as Independent Owner-Operators ("IOOs").   (Am. Compl. ¶ 42.) The drayage industry performs a critical function in the Ports' operations and involves thousands of trucks and truck drivers.

The economic benefits provided by the drayage industry, however, are offset, in no small part, by the considerable environmental and public health costs it generates.   The thousands of diesel trucks that provide drayage services at the

---

[1]      POLA and POLB are managed by their respective boards of harbor commissioners, whose members are appointed by each city's respective mayor. (Am. Compl. ¶¶ 9-10.)

2

Ports contribute significantly to the serious air pollution problem in the region. (Decl. of Elaine Chang ¶¶ 7-12.) Indeed, emissions data provided by California's South Coast Air Quality Management District reveals that in 2002 the Ports were responsible for 24 percent of the total diesel particulate matter, 11 percent of the nitrogen-oxides pollutants, and 45 percent of the sulfur-oxides pollutants emitted in the surrounding air basin. (*Id.* ¶ 7.) Still other data indicate that a possible consequence of drayage truck emissions are significantly higher cancer rates in the affected areas. (*Id.* ¶ 10.) If such emissions are not abated, California state authorities contend there is even a real potential for hundreds of premature deaths between 2010 and 2014 and thereafter. (*Id.* ¶¶ 11-12.)

In December 2007, the California Air Resources Board ("CARB") promulgated new rules mandating restrictive new limits on emissions from diesel trucks at California's ports. (Am. Compl. ¶ 45.) POLA and POLB thereafter crafted multi-faceted "Clean Truck Programs" to both reduce emissions associated with drayage services and improve the Ports' safety and security.[2] The Ports' CTPs, while not identical, share many of the same components and were crafted, in part, collaboratively. As part of their CTPs, both Ports adopted a tariff amendment that imposes a "rolling truck ban" under which certain older trucks are

---

[2] The CARB's rules phase in limits on drayage truck emissions, requiring ultimately that by the end of 2013 all drayage trucks be equipped with engines that meet or exceed Environmental Protection Agency 2007 emissions standards. (Am. Compl. ¶ 45; Declaration of Robert M. Blair ¶ 44.) In response to the CARB's new rules, the Ports collaboratively drafted the San Pedro Bay Ports Clean Air Action Plan ("CAAP"), which set emissions-related goals for their operations. (Am. Compl. ¶ 47.) The Ports' CTPs are elements of the CAAP.

gradually prohibited from providing drayage services at each respective port, beginning with a ban on pre-1989 trucks that commenced October 1, 2008 and culminating January 1, 2012 with a ban on all trucks that do not meet Environmental Protection Agency ("EPA") 2007 truck emissions standards.[3] (Am. Compl. ¶ 52; Holmes Decl. ¶¶ 12-13.)  Both Ports also adopted a tariff amendment instituting a Clean Truck Fee of $35 to be paid by cargo owners for each twenty-foot container leaving each respective port on certain older trucks.[4] (Am. Compl. ¶¶ 54, 87; Holmes Decl. ¶ 14.)  The Ports intend to use the money raised by their Clean Truck Fees, along with money received from the state, to fund a subsidy program for the replacement, or retrofit, of older trucks that do not meet EPA 2007 emissions standards.  (Am. Compl. ¶ 54; Holmes Decl. ¶ 14.) Finally, both Ports crafted a concession agreement into which all LMCs must enter in order to continue (or commence) providing drayage services at each respective port.  (Am. Compl. ¶¶ 57-60; Holmes Decl. ¶ 15.)  The concession agreements set forth certain safety and other requirements with which all trucks entering the port must comply.[5]  (Am. Compl. ¶ 61.)

---

[3]     Intermediate junctures include:  January 1, 2009, at which time all 1989-1993 trucks will become banned; January 1, 2010, at which time all 1994-1996 trucks will become banned; and January 1, 2011, at which time all unretrofitted 1997-2003 trucks will become banned.  (Am. Compl. ¶ 52.)

[4]     The Clean Truck Fee for forty-foot containers is $70.

[5]     For example, both Ports' concession agreements require LMCs to maintain accurate information on each of their trucks and drivers in the Ports' Drayage Truck Registry, to take responsibility for their drivers' compliance with the Ports' CTPs, and to ensure that their drivers have valid Transportation Worker Identification Cards and that their trucks have Radio Frequency Identification Devices.  (Am. Compl. ¶ 61.)

The Ports' CTPs differ, however, in certain critical respects. First, POLA's concession agreement phases in over five years a requirement that all LMCs serving POLA use employee drivers, rather than IOOs. (Am. Compl. ¶ 56.) The first deadline occurs in the fourth quarter of 2009, during which period an average of twenty percent of drayage truck drivers serving POLA must be employees of an LMC. (Am. Compl., Ex. B, POLA Concession Agreement ¶ III(d).) POLB, in contrast, did not adopt such an "employee mandate," instead allowing LMCs to continue to utilize IOOs for the foreseeable future. (Am. Compl. ¶ 62.) Second, the Ports crafted slightly different exemptions to their Clean Truck Fees. For example, while POLA exempts from the fee all diesel trucks compliant with EPA 2007 truck emissions standards purchased without a CTP subsidy, POLB does not. (Am. Compl. ¶ 88.)

## B.    *The Federal Maritime Commission*

The FMC is an independent federal agency responsible for administering the Shipping Act. Under the Shipping Act, the FMC has jurisdiction over the rates, practices, and certain agreements of Marine Terminal Operators ("MTOs"), such as the Ports.[6] 46 U.S.C. §§ 40301(b), 40501(f)-(g), 41102(c), 41103, 41106. In pertinent part here, the Shipping Act provides that agreements between MTOs to "engage in exclusive, preferential, or cooperative working arrangements, to the

---

[6]    A "Marine Terminal Operator" is defined under the Shipping Act, in pertinent part, as "a person engaged in the United States in the business of providing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier." 46 U.S.C. § 40102(14).

extent the agreement involves ocean transportation in the foreign commerce of the United States," must be filed with the FMC.[7] *Id.* §§ 40301(b), 40302. With such filing, the agreement receives an exemption from the antitrust laws upon becoming effective. 46 U.S.C. § 40307(a)(1). In exchange, however, the FMC reviews the agreement for compliance with the Shipping Act and can deny or modify the agreement as it determines necessary to ensure compliance with the Shipping Act's enumerated prohibitions.[8] 46 U.S.C. § 41102(b)(1)-(2). In addition, the Shipping Act provides a "general standard" in Section 6(g) under which the FMC may seek to enjoin anticompetitive conduct by MTOs who are parties to an agreement within the FMC's jurisdiction. Section 6(g), codified at 46 U.S.C.§ 41307(b)(1), provides in pertinent part:

> If . . . the [FMC] determines that the agreement is likely, by a reduction in competition, to produce an unreasonable reduction in transportation service or an unreasonable increase in transportation cost, the [FMC] . . . may bring a civil action in the United States District Court for the District of Columbia to enjoin the operation of the agreement.

The FMC's available remedies are set forth in Section 6(h) of the Shipping Act, codified at 46 U.S.C. § 41307(b)(2), which provides that the Court may issue a temporary restraining order, preliminary injunction, and, after a showing that the

---

[7]     An "agreement" under the Shipping Act is defined, in pertinent part, as "a written or oral understanding, arrangement, or association, and any modification or cancellation thereof." 46 U.S.C. § 40102(1).

[8]     For example, under the Shipping Act MTOs may not impose undue or unreasonable prejudice or disadvantage with respect to any person. 46 U.S.C. § 41106(2).

agreement is likely to have the effect described in Section 6(g), a permanent injunction.[9]

## C.   *FMC's Section 6(g) Determination as to the Clean Truck Programs*

In June 2006, the Ports filed with the FMC an agreement entitled Los Angeles and Long Beach Port Infrastructure and Environmental Programs Cooperative Working Agreement ("Agreement No. 201170"). (Am. Compl. ¶ 63.) The agreement, which became effective on August 10, 2006, authorized the Ports to confer, discuss, exchange information, and agree on a voluntary basis on the funding, establishment, and construction of port-related transportation infrastructure projects and environmental programs. (*Id.* ¶¶ 26, 63.) The Ports subsequently began developing their CTPs, a process which included innumerable public meetings and the receipt of public comment from interested stakeholders. (Holmes Decl. ¶ 10; *see generally* Decl. of Robert M. Blair ("Blair Decl.") at 3-11.) As the CTPs took their final form, the FMC informed the Ports in May 2008 that Agreement No. 201170 did not adequately describe the Ports' coordination on their CTPs for purposes of the FMC's review for compliance with the Shipping Act. (Am. Compl. ¶ 64.) On August 1, 2008, the Ports responded by filing an amended version of their agreement ("Agreement No. 201170-001").[10] (*Id.* ¶¶ 64-

---

[9]      These enumerated equitable remedies are FMC's sole available remedies under the Shipping Act for a Section 6(g) violation. 46 U.S.C. § 41307(b)(1).

[10]      The Ports also filed three additional agreements with the FMC related to their CTPs. They included a Port/Terminal Operator Administration and Implementation Agreement (No. 201178), a Marine Terminal Agreement (No. 201196), and a Port Fee Services Agreement (No. 201199). (Am. Compl. ¶¶ 68-71; Blair Decl. ¶ 99.) The

65.) The amended agreement provided that the Ports could "discuss, exchange information, cooperate, and, to the extent each Port in its sole discretion deems appropriate, coordinate" the adoption of drayage truck deadlines, a clean truck fee, and concession programs with LMCs. (*Id.* ¶ 66; *id.*, Ex. D, Agreement No. 201170-001, Art. V.E.) The Ports began implementation of their CTPs soon thereafter, beginning with imposition of the rolling truck ban on October 1, 2008. (Am. Compl. ¶ 52.)

On October 29, 2008, the FMC determined that Agreement No. 201170-001 violated Section 6(g)'s general standard. Two days later, the FMC filed this lawsuit against the Ports, the cities of Los Angeles and Long Beach, and the cities' respective harbor departments and boards of harbor commissioners (collectively, the "defendants"). (*Id.* ¶¶ 32, 82.) The FMC then moved for the instant preliminary injunction on November 17, 2008. Briefing was completed by the parties on December 3, 2008, and this Court heard oral argument on December 5, 2008. Supplemental briefs were filed December 17, 2009. The FMC alleges that POLA's employee mandate and the Ports' disparate Clean Truck Fee exemptions and subsidies were developed collaboratively by the Ports under the auspices of Agreement No. 201170-001 and are likely to cause an unreasonable increase in transportation costs and an unreasonable decrease in transportation services. (*Id.* ¶¶ 94, 97, 100.) Based on an analysis performed by the FMC's economist, the

---

FMC's challenge here, however, is based solely on Agreement No. 207110-001. (Am. Compl. ¶¶ 93-101.)

FMC contends that these aspects of the Ports' CTPs could result in several billion dollars in reduced net benefits by 2025 as compared with net benefits achievable if the Ports restructure their CTPs to eliminate POLA's employee mandate and harmonize their Clean Truck Fee exemptions. (FMC's Mem. In Supp. at 29 [Dkt. #3]; Decl. of Roy J. Pearson ("Pearson Decl.") ¶¶ 14, 51.) The FMC further contends that the CTPs, as currently structured, will transform the drayage market from a competitive market to a severely constrained market in which surviving LMCs will be able to increase prices above competitive levels while offering inferior services. (FMC's Mem. In Supp. at 35-36; Pearson Decl. ¶ 13.) The FMC, accordingly, seeks to enjoin the Ports from discussing, agreeing as to, or implementing POLA's employee mandate and the Ports' disparate Clean Truck Fee exemptions and subsidies.[11] (FMC's Mem. In Supp. at 45.) In addition, the FMC seeks a novel standard for its motion for a preliminary injunction. For the

---

[11]     Notably, in July 2008 in the U.S. District Court for the Central District of California the American Trucking Association, Inc. ("ATA") moved for a preliminary injunction enjoining the Ports from implementing their CTP concession agreements. The ATA argued, among other things, that the concession agreements are preempted under the Federal Aviation Administration Authorization Act ("FAAA"). On September 9, 2008, Judge Snyder denied the ATA's motion, determining that the ATA had demonstrated neither a substantial likelihood of success on the merits nor irreparable harm and that the balance of hardships and public interest weighed against a preliminary injunction. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 577 F. Supp. 2d 1110, 1125-28 (C.D. Cal. 2008). On March 20, 2009, the 9th Circuit reversed Judge Snyder's decision and remanded the case. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, --- F.3d ----, 2009 WL 723993 (9th Cir. March 20, 2009). The 9th Circuit held that it is likely that many of the concession agreements' provisions are, in fact, preempted, *id.* at *9, that the ATA has established a likelihood of irreparable harm, *id.* at *11-12, and that the equities favor a preliminary injunction, *id.* at *12. At the time of this decision, the district court in that case has not yet issued a decision on the ATA's motion for a preliminary injunction on remand.

following reasons, the Court adopts the traditional preliminary injunction standard

and concludes that the FMC has not met its burden thereunder.

## DISCUSSION

### I.     Legal Standard

In the 24 years since their enactment, the instant action is the first time the

FMC has sought a preliminary injunction pursuant to Sections 6(g) and 6(h) of the

Shipping Act.[12]  As such, the standard to be applied is a question of first

impression.  The defendants contend that, absent a clear indication from Congress

to the contrary, the Court must apply the four-part test traditionally applied in

preliminary injunction situations.  That test, as recently articulated by the Supreme

Court, requires a movant to demonstrate: (1) that it is likely to succeed on the

merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary

relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is

in the public interest.  *Winter v. Natural Res. Defense Counsel, Inc.*, --- U.S. ----,

129 S. Ct. 365, 374 (2008); *see also CityFed Fin. Corp. v. Office of Thrift*

*Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995); *Washington Metro. Area Transit*

*Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).  Under the

traditional test, the Court must balance the competing claims of injury, consider

the effect on each party of granting or withholding the requested relief, and pay

particular regard for the public consequences.  *Winter*, 129 S. Ct. at 376-77.

Indeed, "[a] preliminary injunction is an extraordinary remedy never awarded as

---

[12]     Indeed, this is the first time the FMC has invoked these provisions at all.

of right," *id.* at 376, and only where "the movant, *by a clear showing*, carries the burden of persuasion" may the Court award such relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotation marks and citation omitted) (emphasis in original).

The FMC disagrees. It contends that the traditional four-part test should not apply to actions brought pursuant to Section 6(g); rather, the FMC argues that the Court need *only* assess whether the FMC has a substantial likelihood of success on the merits. (FMC Mem. In Supp. at 20.) To support its position, the FMC points to the text of Section 6(h), its legislative history, and purported parallel case law addressing the enforcement authority of the Securities and Exchange Commission ("SEC") and Commodities Future Trading Commission ("CFTC"). (*Id.* at 20-22.) For the following reasons, I disagree and hold that the traditional four-part test applies to the FMC's motion for a preliminary injunction.

While "Congress may intervene and guide or control the exercise of the courts' discretion," this Court must not, and will not, "lightly assume that Congress has intended to depart from established principles" absent clear language to that effect. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (citing *Hecht Co. v. Bowles,* 321 U.S. 321, 329 (1944)). Indeed, "unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Id.* (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)); *see also U.S. v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496 (2001)

11

("[W]hen district courts are properly acting as courts of equity, they have

discretion unless a statute clearly provides otherwise."). Here, neither Section

6(h)'s plain language nor its legislative history provide a clear indication that

Congress intended for this Court to set aside its traditional four-part preliminary

injunction test.

Section 6(h), as codified, states:

In an action under this subsection, the court may issue --
(A) a temporary restraining order or a preliminary injunction; and
(B) a permanent injunction after a showing that the agreement is
likely to have the effect described in [Section 6(g)].

46 U.S.C. § 41307(b)(2). While Section 6(h), as codified, provides a clear

indication as to Congress' intended standard for a *permanent* injunction – namely,

that the agreement "is likely to have the effect described in [Section 6(g)]" –

Section 6(h) *does not* indicate on its face any limitation on the Court's equitable

discretion nor prescribe a specific, limited standard for a *preliminary* injunction.

*Id.* In fact, FMC's proffered interpretation, applying the expressly-stated Section

6(g) standard for a permanent injunction to the separate preliminary injunction

provision, is, to say the least, a stretch. Provisions (A) and (B) stand alone and

nothing in the language of the statute indicates that the Court should conflate

them.[13] Moreover, a review of Section 6(g)'s legislative history does not provide

---

[13]      Section 6(h)'s language as enacted in the Shipping Act of 1984 similarly indicates
that Congress did not intend for this Court to apply the same standard when determining
whether to enter a permanent injunction versus a preliminary injunction. The Shipping
Act provides:

affirmatively, or by inference, that Congress intended for the courts to abrogate the

traditional preliminary injunction test when considering a motion for preliminary

injunctive relief under Section 6(h). *See* H.R. Conf. Rep. No. 98-600 (1984), *as*

*reprinted in* 1984 U.S.C.C.A.N. 283, 287-293.  Indeed, if any inference is to be

drawn, the Conference Report's *failure* to explicitly reject the traditional

preliminary injunction test indicates that the traditional standard in fact does apply,

given that the precursor to the compromise general standard adopted in Section

6(g) was added by the House Judiciary Committee, which expressly referenced the

---

(h) Injunctive Relief.  The Commission may, upon making the
determination specified in subsection (g), bring suit in the United States
District Court for the District of Columbia to enjoin operation of the
agreement. The court may issue a temporary restraining order or
preliminary injunction and, *upon a showing that the agreement is likely,*
*by a reduction in competition, to produce an unreasonable reduction in*
*transportation service or an unreasonable increase in transportation cost,*
may enter a permanent injunction.

Pub. L. No. 98-237, § 6(h), 98 Stat. 67 (1984) (emphasis added).  In addition,
while it is a recognized principle of statutory construction that when "Congress
includes particular language in one section of a statute but omits it in another
section . . ., it is generally presumed that Congress acts intentionally and
purposely," *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (quotation
marks and citation omitted), I do not find a clear indication of Congressional
intent to strip this Court of its traditional equitable discretion by negative
inference from Section 11(h) of the Shipping Act, as urged by the FMC.  (FMC
Mem. In Supp. at 21, n.8.)  Section 11(h), codified at 46 U.S.C. § 41307(a), grants
the FMC authority to seek preliminary injunctive relief in connection with an
ongoing FMC investigation for violation(s) of the Shipping Act other than a
violation of the Section 6(g) anticompetitive standard.  While Section 11(h), as
codified, states "after . . . a showing that the standards for granting injunctive
relief by courts of equity are met, the court may grant a temporary restraining
order or preliminary injunction," *id.*, the Shipping Act's failure to include similar
language in Section 6(h) does not sufficiently establish an inescapable inference
that Congress intended for the Court to abrogate its traditional four-part test when
the FMC invokes Section 6(h) to seek preliminary injunctive relief.

traditional four-part test in its report.[14]  H.R. Rep. No. 98-53(II) (1983), *as reprinted in* 1984 U.S.C.C.A.N. 221, 230.  Accordingly, the Court is not persuaded that the FMC is entitled, absent explicit direction from Congress, to a preliminary injunction standard that assesses only the FMC's likelihood of success on the merits and disregards irreparable harm, the balance of equities, and the public interest.[15]  *Cf. FTC v H.J. Heinz, Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001)

---

[14]     The Judiciary Committee report provides:

> With respect to [violations of the competition standard], the Commission's sole remedy is to seek temporary or permanent injunctive relief in the United States District Court for the District of Columbia. The burden is on the Commission to show that the standards for injunctive relief are met. If the Commission seeks preliminary injunctive relief, it must meet the traditional preliminary injunction standards, offering proof on factors such as a likelihood of success on the merits and a threat of irreparable injury.

H.R. Rep. No. 98-53(II) (1983), *as reprinted in* 1984 U.S.C.C.A.N. 221, 230.  In addition, the FMC's focus on the Conference Report's discussion of FMC's relevant expertise and the need for prompt action to stop threatening conduct also misses the mark.  The Conference Report discusses these factors only in relation to the Committee's decision to grant an exception to the principle of centralized government litigation authority by giving the FMC litigation authority in the District Court.  H.R. Conf. Rep. No. 98-600, 1984 U.S.C.C.A.N. at 288.  The Court also notes that during the deliberation preceding Congress's enactment of the Ocean Shipping Reform Act ("OSRA"), which amended the Shipping Act, the FMC suggested that the 6(g) standard be incorporated into the prohibited acts section of the Shipping Act so that the FMC could act upon anticompetitive agreements directly.  The Senate Report for the OSRA states that the suggestion was rejected and that the FMC would be required to continue to seek to enjoin such agreements in federal courts.  S. Rep. No. 105-61, at 17 (1997), *available at* 1997 WL 441767, at *17.

[15]     The Court does not find the "statutory injunction" line of cases involving CFTC and SEC enforcement cited by the FMC controlling or persuasive here.  *See Commodity Future Trading Comm'n v. British Am. Commodity Options Corp.*, 560 F.2d 135, 141-42 (2d Cir. 1977) (affirming that the CFTC need not show irreparable injury in order to obtain a preliminary injunction under Section 6c, 7 U.S.C. § 13a-1, of the Commodity Exchange Act); *SEC v. Gen. Refractories Co.*, 400 F. Supp. 1248, 1254-55 (D.D.C. 1975) (no showing of irreparable injury required where SEC seeks preliminary injunction under Section 21(e) of the Securities Exchange Act, 15 U.S.C. 78u(e), where defendants were engaged in conduct violative of the Act) (citing *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d

(citing statutory text and explicit statements in legislative history to establish that Congress intended for courts to depart from the traditional equity standard for preliminary injunctions under Section 13(b) of the Federal Trade Commission Act).

## II.   Application of the Preliminary Injunction Standard

Applying the traditional preliminary injunction standard, the Court finds that the FMC has failed to demonstrate the necessary likelihood of success on the merits and irreparable harm to carry its burden.  How so?

### A.   *Likelihood of Success on the Merits*

Under the Section 6(g) standard, to succeed on the merits the FMC must prove that (1) the agreement the FMC seeks to enjoin is likely to cause a reduction in competition, (2) the reduction in competition is likely to cause an increase in transportation cost or a decrease in transportation service, and (3) the likely reduction in transportation service or increase in transportation cost is "unreasonable."  46 U.S.C. § 41307(b)(1); *see* S. Rep. No. 105-61, at 14-15 (1997), *available at* 1997 WL 441767, at *14-15.  Assuming for the purposes of this decision that the FMC has jurisdiction over Agreement No. 201170-001 to

---

801 (2d Cir. 1975)).  Merely because the FTC is a federal agency seeking to enforce a federal statute does not *per se* require a departure from the traditional standard; this Court must still look to whether Congress made a clear indication that it meant to displace the traditional test.  *See, e.g., Gold v. State Plaza, Inc.*, 435 F. Supp. 2d 110, 115-18 (D.D.C. 2006) (refusing to depart from traditional test for equitable relief in action brought under Section 10(j) of the National Labor Relations Act where agency had discretion to seek preliminary injunction and Congress did not expressly or by inference limit the court's equitable discretion (citing *D'Amico v. U.S. Serv. Indus., Inc.*, 867 F. Supp. 1075 (D.D.C. 1994))).

pursue the relief it seeks, the FMC has not established, at a minimum, that it is likely that Agreement No. 201170-001 is likely to cause the requisite reduction in competition under Section 6(g)'s standard.[16]

The FMC makes competing assertions as to which market is the relevant market in which competition is likely to be reduced.  In its Memorandum in Support of its Motion for a Preliminary Injunction, the FMC asserts that the Ports' requirements that LMCs execute the Ports' respective concession agreements will give larger LMCs market power and thereby reduce competition in the drayage market, concluding that "the concession plans reduce the number of LMCs from which cargo owners or other users of port drayage services may choose, which is a predicate under [S]ection 6(g)."  (FMC's Mem. In Supp. at 35-36.)  Conversely, the FMC asserts in its Supplemental Brief that the relevant reduction in competition is that between the Ports themselves, asserting that "the attendant reduction in competition between the ports themselves . . . is the basis of the [Section] 6(g) challenge" and that its economist's "analysis focused upon a reduction in competition between the two Ports."  (FMC's Supp. Br. at 6, 11 [Dkt. #29].)

---

[16]    At the time of this decision the defendants' motions to dismiss the FMC's Amended Complaint are pending.  The motions argue, among other things, that the FMC does not have jurisdiction under the Shipping Act to bring this action because the relevant portions of Agreement No. 201170-001 do not "involve[] ocean transportation in the foreign commerce of the United States," as required under § 4(b)(2) of the Shipping Act, codified at 46 U.S.C. § 40301(b)(2).  Because this decision applies only to the FMC's motion for a preliminary injunction, the Court does not address the arguments advanced in defendants' motions to dismiss.

The FMC's arguments under both positions, however, suffer from critical flaws. First, while the provisions the FMC challenges – the POLA employee mandate, the Clean Truck Fee and its exemptions, and the Ports' subsidy programs – may indeed cause some IOOs and smaller LMCs to cease operation in their current form or exit the drayage market, the FMC has not established that the drayage market will suffer a reduction in *competition*. (Decl. of Joseph P. Kalt ("Kalt Decl.") ¶¶ 24, 28.) Indeed, the FMC's economist concedes that as of mid-October 2008 almost 800 LMCs had signed up for POLA concession agreements (Pearson Decl. ¶ 80; Holmes Decl. ¶ 36),[17] which results in an unconcentrated market under the Herfindahl-Hirschman Index ("HHI").[18] (*Id.* ¶¶ 26-27, 33; *see also* Decl. of Simon Goodall ("Goodall Decl.") ¶ 15.) In addition, the FMC's economist also concedes that barriers to entry in the drayage industry are low (Pearson Decl. ¶¶ 55, 80), which means that even if the LMC market became concentrated enough for certain LMCs to exercise market power and raise prices while reducing services, other LMCs could enter the market and bid the price

---

[17]     As of November 26, 2008, POLB had similarly granted more than 700 concessions to concessionaires who control nearly 14,000 trucks. (Decl. of Robert G. Kanter ¶ 22.)

[18]     HHI is a market concentration measurement tool used by the Department of Justice and the Federal Trade Commission to evaluate the impact of horizontal mergers on market concentration and, in turn, the ability for firms to engage in anticompetitive conduct, such as the exercise of market power to raise prices above competitive levels. *H.J. Heinz, Co.*, 246 F.3d at 715-16, n.9 (assessing HHI of proposed merger to determine whether government established prima facie case that merger would lessen competition). HHI is calculated by summing the squares of the individual market shares of all the participants in the market. U.S. Dep't of Justice & Federal Trade Comm'n, *Horizontal Merger Guidelines*, § 1.5 (1992), *as revised* (1997). A market with an HHI below 1000 is considered unconcentrated. *Id.* § 1.51.

down. (Goodall Decl. ¶ 16.) Accordingly, while the CTPs may marginally raise the costs of shipping goods, the raise would appear not to be due to a reduction in competition, but rather merely to the costs associated with complying with the CTPs. (Kalt Decl. ¶ 31.) Thus, the FMC's assertion that the remaining LMCs in the market "will be able to substantially raise prices and increase profit margins above previously competitive levels," (FMC's Mem. In Supp. at 35; *see also* Pearson Decl. ¶¶ 19, 81), is wholly unsupported in the record.

Second, if the relevant reduction in competition is that between the Ports, as parties to Agreement No. 201170-001, the FMC's allegation also falls flat. This is because the aspects of the CTPs that the FMC alleges will cause an unreasonable reduction in transportation service and increase in transportation cost – the POLA employee mandate and the disparate Clean Truck Fee exemptions and related subsidies – are areas in which the Ports disagree and thus are actually *in competition.*[19] (Holmes Decl. ¶¶ 67-69; Kalt Decl. ¶¶ 11, 17, 21; Goodall Decl. ¶ 11.) Under Section 6(g) of the Shipping Act, the FMC bears the burden of establishing a link between the alleged reduction in competition and the alleged likely reductions in transportation service or increases in transportation cost. 46 U.S.C. § 41307(b)(1). Here, the record lacks any direct evidence that the differences between the Ports' CTPs are anything but the result of divergent policy views as to the most effective way to structure their respective CTPs, which

---

[19]     Given the FMC's failure on either ground to establish a reduction in competition, the Court need not, and therefore does not, decide at this time which market is the relevant market for purposes of Section 6(g).

require careful balancing of environmental, technical, fiscal, and commercial considerations.[20] The FMC argues, nevertheless, that POLB's failure to adopt identical Clean Truck Fee exemptions in order to secure a competitive advantage over POLA is evidence that the Ports must have "harmonized" their decisions in support of POLA's employee mandate, thereby reducing competition between the Ports. (FMC's Mem. In Supp. at 31; Pearson Decl. ¶ 18, n.4). The FMC, however, fails to offer any direct evidence to support this allegation or, for that matter, any plausible motive for crafting divergent CTPs in a *harmonious* fashion.[21] Indeed, keeping drayage costs as low as possible – and thus, keeping drayage industry competition as fierce as possible – is in the Ports' interests. (Kalt Decl. ¶ 20). Accordingly, in the absence of any evidence of a reduction in competition between the Ports as to the challenged aspects of the CTPs, the FMC's cost/benefit analysis of those provisions is *not* an analysis of the effect of a reduction in competition between the Ports, but merely an analysis of the costs of the Ports' different environmental requirements. Thus, the FMC has failed to show that it is likely to establish the requisite reduction in competition required under Section 6(g).

---

[20]    Ironically, the FMC's position in this case appears to be that the Ports should have harmonized their CTPs more than they in fact did, thereby limiting even further competition between the Ports. (Pearson Decl. ¶ 67, n.51.)

[21]    Moreover, while Agreement No. 201170-001 provides the Ports the authority to coordinate their decisions as to their CTPs, it expressly denies either port the ability to restrict the other port's ability to compete by providing that "[n]othing in this agreement shall be interpreted to require a Port to obtain approval or consent from the other Port before making any changes to its own Clean Truck Program." (Agreement No. 201170-001, Art. V.I.)

**B.     *Irreparable Harm***

In addition to the FMC's weak showing on the merits, the FMC has also failed to make a sufficient showing on irreparable harm.  In order to secure a preliminary injunction, a plaintiff must "demonstrate that irreparable injury is *likely* in the absence" of such relief.  *Winter*, 129 S. Ct. at 375 (citing *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)) (emphasis in original).  Our Circuit has set a high standard for irreparable harm, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006), and injunctive relief "will not be granted against something merely feared as liable to occur at some indefinite time." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931)).  The alleged injury must be of such "imminence" that there is a clear and present need for equitable relief to prevent irreparable harm.  *Id* (citation omitted).  In addition, in ordinary circumstances economic loss alone will rarely constitute irreparable harm; the very existence of a business entity must be threatened in order for the harm to be irreparable.  *Id.*

Here, the FMC's irreparable harm claims are based primarily on economic harms the FMC's economist predicts IOOs, and the LMCs that employ them, will suffer as a result of the POLA employee mandate.  Relying on declarations from several drayage market participants, the FMC alleges that even though the employee mandate is scheduled to be phased in over five years, numerous IOOs will be forced out of the market by the time the merits are decided because the

employee mandate will cause LMCs to begin restructuring their operations immediately.  (FMC's Mem. In Supp. at 42-44; FMC's Reply at 11-12 [Dkt. #16].)  The FMC further alleges that the CTPs' Clean Truck Fees and exemptions will exacerbate this harm and force small LMCs out of the market because cargo owners will shift their business to large LMCs that can afford to utilize cleaner trucks that are exempt from the fees.  (FMC's Suppl. Mem. at 15-16 [Dkt. #29].)  The FMC then ties these projected economic harms to the drayage market generally, alleging that the progressive elimination of IOOs and the Clean Truck Fees' effects on small LMCs will cause an immediate, anticompetitive, and irreversible restructuring of the drayage market.  (FMC's Reply at 11-12; FMC's Suppl. Mem. at 15-16.)  I disagree.

In my judgment, the FMC has failed to demonstrate that this alleged harm to competition in the drayage market is sufficiently likely, or sufficiently imminent, to establish the requisite irreparable harm to warrant a preliminary injunction.  While the FMC provides evidence that some IOOs and some smaller LMCs may be adversely affected by the employee-mandate and the Clean Truck Fees and exemptions, the FMC has *not* established that these changes are likely to result in irreparable harm to overall competition in the drayage market or to the shipping public.  As discussed above, the record indicates that the drayage market remains unconcentrated and the FMC concedes that barriers to entry in the drayage market are low.  In light of these conditions, even assuming the adverse effects on IOOs and small LMCs the FMC alleges will come to fruition, the FMC

21

has not established that it is likely that they will result in an *anticompetitive* restructuring of the drayage market. Moreover, it remains that the first deadline under the POLA employee mandate is not until the fourth quarter of 2009 and it only requires that an average of twenty percent of LMC drivers be employees at that juncture. (POLA Concession Agreement ¶ III(d); *see also* Decl. of Ramses A. Villavicencio ¶¶ 16-18.) Accordingly, given this gradual imposition of the employee mandate, the Court is not persuaded that any resulting effects on the drayage market are sufficiently irreversible or imminent to constitute irreparable harm.[22]

## C.   *Balance of Equities & Public Interest*

Finally, I find that the balance of equities and the public interest weigh in favor of denying the FMC's motion for a preliminary injunction. As the Supreme Court recently directed, it is imperative that this Court balance the competing claims of injury and the effect an injunction would have on each party. *Winter*, 129 S. Ct. at 376, 378 (reversing grant of preliminary injunction after assuming irreparable harm and without addressing the underlying merits of the plaintiffs'

---

[22]   The Court notes that its irreparable harm inquiry in this case is distinct from that made by the 9th Circuit in *Am. Trucking Ass'ns, Inc.*, --- F.3d ----, 2009 WL 723993, at *9-12. There, the 9th Circuit found that LMCs faced a "Hobson's Choice" between complying with various provisions of the concession agreements that are likely to be unconstitutional as preempted by the FAAA or giving up their business as drayage service providers. *Id.* That case, however, differs from this case in two critical respects. First, whereas the 9th Circuit focused solely on the alleged irreparable harm to LMCs, whose interests are directly represented and advanced in that case, the alleged harm at issue here is harm to competition in the drayage market broadly and its impact on transportation costs and services. Second, the 9th Circuit's irreparable harm analysis included as a given that the Ports' concession agreements include unconstitutional provisions, which is a factor *not* applicable here.

claim).  In addition, this Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 376-77 (quoting *Romero-Barcelo*, 456 U.S. at 312).

Like any new regulation that imposes new costs, the Ports' CTPs may cause some LMCs to change their business practices, raise rates, or even exit the market.  In addition, the CTPs may cause some drivers to cease operating as IOOs as the POLA employee mandate gradually phases in, thereby altering the existing drayage market dynamic.  Any such *potential* economic harms and changes to the drayage market, however, must be weighed against the harm to the Ports and the greater San Pedro Bay region if the portions of the CTPs the FMC challenges are enjoined pending a decision on the merits.  While the FMC argues that these portions are not necessary for achieving a majority of the CTPs' environmental, public health, and safety and security goals (FMC's Mem. In Supp. at 35; Pearson Decl. ¶ 16), the defendants counter that these provisions indeed are necessary to the overall success of the Ports' respective CTPs and that to enjoin them now would injure those LMCs and IOOs that are relying on them as well as stunt the environmental and public health benefits the region will otherwise achieve, (Holmes Decl. ¶¶ 31-34, 50-51).  I agree.

First, it is important to note that the CTPs represent the judgment of the cities' elected and appointed officials based on multi-year deliberative processes that involved innumerable public meetings and the receipt and review of comments from a wide range of stakeholders.  (Holmes Decl. ¶ 10.)  The Ports'

boards of harbor commissioners consequently determined that the Clean Truck

Fee exemptions and funding mechanisms provide necessary relief for drayage

industry participants in connection with the costs associated with transitioning to

newer, cleaner trucks, as required by the rolling truck ban. (Holmes Decl. ¶¶ 14,

26-28, 53.) Without these provisions, the number of clean trucks currently serving

the Ports will decrease and significantly fewer clean trucks will enter into service,

thus reducing the environmental and health benefits gained to date and expected to

be gained the future. (Holmes Decl. ¶¶ 28, 50-51.) In addition, POLA's board of

harbor commissioners determined that its employee mandate will promote

enhanced efficiency in the provision of drayage services at its port, as well as

better ensure compliance with its CTP requirements and enhance port security

both by providing POLA with enhanced access control and by ensuring LMCs are

accountable for their drivers. (Holmes Decl. ¶¶ 15, 31-34, 39, 46-47.) Given the

immediate impact enjoining these provisions could have on these aspects of the

CTPs, the success of which are critical to addressing the significant air pollution in

the area, the Court is not persuaded that they are outweighed by the speculative

harm to the drayage market alleged by the FMC.

     In addition, for many of the same reasons, the public interest also weighs in

the defendants' favor. This case presents the unique situation wherein both parties

are acting to protect the public interest. On the one hand, the defendants are

implementing ambitious, multi-faceted programs to reduce high levels of air

pollution while also striving to improve the Ports' safety and security and to

enable future development.  On the other, the FMC has a statutory responsibility to take prospective action to protect the public from anticompetitive agreements that it believes are likely to unreasonably raise rates and decrease services.  *See* S. Rep. No. 105-61, at 14 (1997), *available at* 1997 WL 441767, at *14.  Ultimately, the dispute at this juncture boils down to a request by the FMC that this Court bless its chosen policy determination over that of the defendants *prior* to a full briefing on the merits.  Given the protracted and public deliberative process that led to the development of the CTPs and the responsibility the defendants have for improving the area's public health and managing the Ports' efficient operations, the Court finds that the public interest, at this point, favors denying the FMC's motion for a preliminary injunction.

## CONCLUSION

Thus, for all of the above reasons, the Court DENIES the FMC's Motion for a Preliminary Injunction.  An appropriate Order will issue with this Memorandum Opinion.

RICHARD J. LEON
United States District Judge